```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION
```

UNITED STATES OF AMERICA,       §
                                §
              Plaintiff,        §
                                §   Criminal No. 3:08-CR-267-D
VS.                             §
                                §
SERGIO DIAZ (5),                §
                                §
              Defendant.        §

                      MEMORANDUM OPINION
                         AND ORDER

Defendant Sergio Diaz ("Diaz) moves to revoke the magistrate judge's order that he be detained without bond pending trial on the basis that he is a danger to the community. The court has reviewed *de novo* the evidence presented at the hearing, including the tape of the detention hearing,[1] and it finds by clear and convincing evidence[2] that no condition or combination of conditions will reasonably assure the safety of any other person and the community

---

[1] "When the district court, pursuant to 18 U.S.C. § 3145(b), acts on a motion to revoke or amend a magistrate's pretrial detention order, the court acts *de novo* and makes an independent determination of the proper pretrial detention or conditions for release." *United States v. Fortna,* 769 F.2d 243, 249 (5th Cir. 1985). The court's review of the record developed before the magistrate judge is an appropriate procedure to comply with that obligation. *See, e.g., United States v. Farguson*, 721 F. Supp. 128, 129 n.1 (N.D. Tex. 1989) (Fitzwater, J.).

[2] The court applies a clear and convincing evidence standard in determining that no condition or combination of conditions will reasonably assure the safety of the community. *See* 18 U.S.C. § 3142(f)(2)("The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence.")

if Diaz is released on bond.³ Accordingly, pursuant to 18 U.S.C. § 3142(e), the court orders that Diaz be detained pending trial.

I

Diaz is charged by indictment with one count of conspiracy to possess with intent to distribute and distribute more than five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956.⁴ Following Diaz's arrest, the government moved to detain him, both as a flight risk and as a danger to the community.

At the detention hearing, a special agent of the U.S. Drug Enforcement Administration ("DEA") testified that, during the course of a long-term investigation, which included court-authorized wire intercepts and physical surveillance of the Hector Rodriguez ("Rodriguez") drug trafficking organization, DEA agents learned that the operations of the organization were as follows. Semi tractor-trailers brought cocaine from Mexico to Dallas, where it was offloaded and taken to a stash location. Rodriguez and his

---

³Because the court is ordering Diaz detained on this basis, it need not decide whether he is a flight risk. *See Fortna*, 769 F.2d at 249 ("[T]he lack of reasonable assurance of *either* the defendant's appearance *or* the safety of others or the community is sufficient [to detain a defendant without bond]; both are not required.").

⁴The indictment also contains a criminal forfeiture allegation.

associates collected and organized money and sent it to Mexico using the tractor-trailers. To date, the DEA has seized $7.5 million, 370 kilograms of cocaine, and over 400 pounds of methamphetamine.

According to the agent, Diaz operates two truck yards in Dallas that are used to deliver cocaine and collect money to be sent to Mexico. Excluding the day of the take-down, the DEA has seized five money transfers attributed to the Rodriguez organization, and all five of the transfers occurred on Diaz's properties.

The first two money transfers occurred at Diaz Diesel Repair, a truck yard believed to be owned by Diaz's father. Based on intercepted telephone calls, DEA agents established surveillance at this yard in anticipation of a transfer. On May 8 and May 28, 2008, agents observed couriers arrive at the yard and transfer money to a tractor-trailer, which then departed for Mexico. Diaz was observed during one of these transactions.

The other three money transfers occurred at a second truck yard that, according to property records, is owned by Diaz. Based on intercepted telephone calls indicating that a money load would be going down, agents established surveillance at this location. On July 23, 2008 two vehicles arrived at the yard and made contact with a semi tractor-trailer. The tractor-trailer departed and was followed until investigators stopped it and recovered approximately

$1.9 million. On August 23, shortly after a courier arrived at the yard, a tractor-trailer departed and was followed until investigators stopped it and recovered $1.25 million. On August 26 a courier arrived at the yard in the same vehicle that agents had observed on August 23. A tractor-trailer departed and was later stopped by investigators who recovered $1.1 million.

The agent also testified that multiple telephone conversations had been intercepted between Diaz and Rodriguez. Rodriguez contacted Diaz to determine whether the truck yards would be available for use. In one telephone call, Diaz told Rodriguez that he knew how to build boxes that could beat X-rays and conceal money or drugs. In another call, Diaz facilitated the purchase of four kilograms of cocaine on behalf of another individual.

Rodriguez twice asked Diaz to bring a "rocket"——a term that investigators know refers to a firearm. One of these requests was made while discussing a courier who had mentioned that some of the people he was dealing with were "acting funny." Rodriguez asked Diaz to go down there and to bring his rocket. On the other occasion, Rodriguez's superiors in Mexico had spoken to him about purchasing tractor-trailers, and Diaz was going to help them shop for trailers. Concerned about the motives of these individuals, Rodriguez recommended that Diaz ride in the front seat with a weapon and that another associate ride in the back with a weapon. Based on the investigation, agents believed that the superiors in

Mexico wanted to use the trailers to transport money or drugs. Agents later observed Diaz shopping with these individuals for tractor-trailers.

Diaz's sister, Gema Diaz Rudalcavan ("Rudalcavan"), testified that Diaz's wife and children, his parents, and all of his siblings (except one sister) live in Dallas. She testified that Diaz is an American citizen, owns a house and a business in Dallas, and has paid his taxes for the last several years. Rudalcavan stated that Diaz's family would assist him in making his court appearances and would assure that he would not be involved in any type of criminal activity. She also testified that Diaz has never been involved in any criminal activity or any violence, and that he has never posed a danger to the community.

Following the hearing, the magistrate judge ordered Diaz detained without bond pending trial, concluding that Diaz had not rebutted the presumption that he is a danger to the community. Diaz now moves for review and revocation of the order.

II

A

An individual shall be released pending trial unless a judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Diaz is charged with a violation of the

Controlled Substances Act, 21 U.S.C. § 801 *et seq.* Specifically, he is charged with conspiracy under 21 U.S.C. § 846, punishable under 21 U.S.C. § 841(b)(1)(A) by imprisonment for a period that "may not be less than 10 years." Under the Bail Reform Act, the existence of probable cause—here, the grand jury indictment—to believe that Diaz committed this offense creates a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community. 18 U.S.C. § 3142(e). "The presumption shifts to the defendant only the burden of producing rebutting evidence, not the burden of persuasion." *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989). The mere production of evidence, however, does not completely rebut the presumption. In making its ultimate determination, "the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society." *Id.* at 798-99.

B

Because an indictment provides probable cause that a defendant committed an offense, *see United States v. Trosper*, 809 F.2d 1107, 1110 (5th Cir. 1987), Diaz's indictment for violating 21 U.S.C. § 846 (punishable under 21 U.S.C. § 841(b)(1)(A)) is sufficient to trigger the statutory presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community. *See id.* (holding that presumption was properly

applied to defendant upon proof that he had been indicted under 21 U.S.C. § 846).

C

The court holds that Diaz has produced sufficient evidence to rebut the presumption of danger to the community. *See Trosper*, 809 F.2d at 1110 ("[T]he burden imposed on the defendant is the production of evidence supportive of the point for which it is offered."). During the hearing, Diaz introduced evidence that supports the inference that he will not engage in drug trafficking if released on bail. On cross-examination of the DEA agent, Diaz established that agents had only once observed him on the property during a money transfer, and even then he was not observed conducting any of the suspected criminal activity, but was merely present on the premises. Through Rudalcavan's testimony and the submission of the Pretrial Services Report, Diaz further showed that, absent a 1992 charge for alien smuggling that was never prosecuted, he has no criminal history. This evidence undermines Diaz's alleged intentional involvement with the Rodriguez organization and the criminal activity it conducted on his property. As such, the rebuttal evidence supports the premise that Diaz will not continue to engage in drug trafficking activities if he is released.

D

Although Diaz has adduced evidence sufficient to overcome the presumption, the court finds from clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community. "The risk of continued narcotics trafficking on bail constitutes a risk to the community." *Hare*, 873 F.2d at 798. Despite the fact that Diaz rebutted the presumption of danger to the community, the presumption still carries evidentiary weight. *Id.* at 798-99. The government has also produced clear and convincing evidence that there is a risk of continued narcotics trafficking if Diaz is released on bail. The DEA has seized millions of dollars from vehicles that originated from Diaz's property. Numerous telephone conversations have been intercepted between organization leader Rodriguez and Diaz evidencing Diaz's knowing involvement and participation in the organization, including conversations about Rodriguez's use of the truck yards, discussions about concealing drugs and money, discussions about carrying a firearm to protect couriers, and an attempt to purchase four kilograms of cocaine for another individual. Moreover, Diaz's connection to the organization extends even farther back than his connection to Rodriguez: DEA agents first identified him during an investigation of Rodriguez's predecessor. The government's evidence therefore shows that Diaz has a significant role in this narcotics operation

and very likely would continue to engage in illegal drug trafficking if released.

The court also finds that the evidence of Diaz's substantial family ties to the Dallas area does not rebut the presumption of danger to the community, because it does not support Diaz's position that he will not continue to traffic in drugs if released on bail. *See United States v. Munoz*, 983 F. 2d 232, 1993 WL 4677, at *3 (5th Cir. 1993) (unpublished table decision) (holding that testimony about family ties to the area "shed[s] no light on the risk that [defendant] would continue to deal in drugs"). Similarly, Rudalcavan's testimony that Diaz's family would assure that Diaz would not be involved in any type of criminal activity if released on bail likewise fails to support his assertion that he does not pose a danger to the community. According to Rudalcavan, Diaz's family is essentially in complete denial of Diaz's activities, despite substantial evidence that he was involved in the Rodriguez organization, which, based on the quantities of drugs and money involved, is a major drug trafficking group. As such, their assurances that they will prevent Diaz from engaging in criminal conduct that they now believe he was not engaged in does not persuade the court that he will not continue to traffic in drugs, if released.

E

After considering all the factors set forth in § 3142(g), the court finds clear and convincing evidence that Diaz is likely to be a danger to any other person and the community unless detained pending trial.

III

Accordingly, Diaz's October 5, 2008 motion for review and revocation of detention order is denied. The court orders that Diaz be held without bond pending the trial of this action as follows. He is committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. He is to be afforded reasonable opportunity for private consultation with his counsel. By order of this court, to be issued in the future, the person in charge of the corrections facility in which Diaz is confined is to deliver him to a United States Marshal for the purpose of appearing in connection with any court proceeding.

**SO ORDERED.**

October 9, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE